IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN DEWEY WILLS, JR.**, <br><br> Plaintiff, <br><br> v. <br><br> **ANDREW GRASLEY, GINSLEY, CANTU, ALLRED, BETH CLOOS, BILBREY,** and **BRANTLEY**, <br><br> Defendants. | Case No. 3:20-cv-191-SI <br><br> **ORDER** |

John Dewey Wills, Jr., Plaintiff, *pro se*.

Natalie K. Wight, United States Attorney, and Alison M. Milne, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      Plaintiff John Dewey Wills, Jr., representing himself, brings this *Bivens*[1] action against Defendants in their individual capacities as federal employees at the Federal Correctional Institution in Sheridan, Oregon (Sheridan), in connection with his medical treatment. Each

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

PAGE 1 – ORDER

remaining defendant[2] worked or formerly worked as medical personnel at Sheridan. On February 3, 2020, Plaintiff, a federal inmate, filed this action alleging that staff at Sheridan were deliberately indifferent to his medical needs between December 2018 and January 2020. Compl., ECF 2.

Before the Court is Defendants' motion for summary judgment, filed on January 31, 2023. ECF 47. As of March 15, 2023, Plaintiff had not filed a response to that motion, so the Court issued a Scheduling Order, informing Plaintiff that if he did not respond to the motion by April 15, 2023, the Court would resolve Defendants' motion without the benefit of his response. ECF 56. Plaintiff has not responded. Thus, as described in its Scheduling Order, the Court considers Defendants' motion without the benefit of Plaintiff's response. For the reasons below, the Court grants Defendants' motion for summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

---

[2] Plaintiff's complaint originally named as defendants Andrew Grasley, Ginsley, Cantu, Allred, Beth Cloos, Bilbrey, and Brantley. The Court granted Defendant Cloos's Motion to Dismiss on July 12, 2022. ECF 46. Remaining Defendants state that the Bureau of Prisons (BOP) does not have a record of anyone named Ginsley working as a doctor or providing medical care at Sheridan. BOP could not identify whom Plaintiff meant as Defendant "Ginsley" but counsel for Defendants believes Plaintiff may be referring to a physician who does not work for BOP.

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

For *pro se* inmates in civil suits, courts must construe the filings and motions liberally. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Recognizing that "unwilling self-representation is coupled with the further obstacles placed in a prisoner's path by his incarceration—for example his limited access to legal materials and to sources of proof," the Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Id.*

Although Plaintiff did not file a response to Defendant's motion for summary judgment, a court may not grant summary judgment by default. *See Heinemann v. Satterberg*, 731 F.3d 914, 916-17 (9th Cir. 2013). When a party fails to respond to a fact asserted by the movant, a court may:

> (1) give [the party] an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). This rule was amended in 2010 to incorporate the "deemed admitted" practice of many courts—when a party fails to respond to an asserted fact, that fact may be "deemed admitted" (considered as undisputed). *Heinemann*, 731 F.3d at 917. The Court will consider as undisputed the facts asserted by Defendants in their unopposed motion.

PAGE 3 – ORDER

Considering a fact as undisputed, however, does not mean that summary judgment automatically may be granted. A court must still determine, considering the facts it has found undisputed for want of a response, the legal consequences and proper inferences to be drawn from those facts. *Id.* (quoting Fed. R. Civ. P. 56 Advisory Committee Notes (2010)). Accordingly, the Court considers Defendants' motion on the merits with the undisputed facts.

## BACKGROUND

### A. Parties

Plaintiff is a self-represented federal inmate serving a 150-month sentence imposed by the U.S. District Court for the District of Oregon on December 9, 2019. Plaintiff was housed at Sheridan from January 7, 2016, when he arrived for pretrial confinement, until March 3, 2020, when he was transferred to a different facility. *See id.* at 4.[3]

Defendants include two groups of Sheridan employees. The first group includes current and former members of the Sheridan Health Services staff: Dr. Andrew Grasley, Dr. Amador Cantu, Dr. David Allred, and the unidentified defendant "Ginsley." *See* Compl. at 15-23. Dr. Grasley is the Clinical Director at Sheridan. Grasley Decl. ¶ 1, ECF 53. He reviewed and co-signed prescriptions, notes, and reports related to Plaintiff's medical care. *Id.* ¶¶ 7-16. Dr. Cantu worked as doctor at Sheridan during the relevant period until he retired in March 2019. Cantu Decl. ¶ 1, ECF 54. Dr. Cantu performed Plaintiff's initial routine history and physical examination and ordered Plaintiff's radiology reports and lab tests in December 2018. *Id.* ¶¶ 5-11. Dr. Allred is a physician employed by the Federal Bureau of Prisons (BOP) who completed a

---

[3] Plaintiff's Complaint states that his claims related to his care at Sheridan occurred from "Dec[ember] 2018 to Jan[uary] 2020, and are ongoing." ECF 2 at 4. Although Plaintiff filed his Complaint while still housed at Sheridan on February 3, 2020, he was transferred from Sheridan on March 3, 2020. *See* Grasley Decl., Ex. A, at 4. As a result, the period at issue is from December 2018 to March 3, 2020.

temporary assignment at Sheridan from December 30, 2019, until January 10, 2020. Allred Decl. ¶¶ 1-2, ECF 55. Dr. Allred saw Plaintiff once for a scheduled chronic care appointment on January 6, 2020. *Id.* ¶ 6-8. Although BOP could not identify Defendant "Ginsley," the Court includes Ginsley in this group based on counsel's suggestion that Ginsley may be a physician.[4]

The second group of Defendants, including Lori Bilbrey and John Brantley, are case and unit managers for Sheridan's Federal Detention Center. In their roles at Sheridan, Bilbrey and Brantley did not provide medical care to any inmates, including Plaintiff. Bilbrey Decl. ¶¶ 4, 8, ECF 48; Brantley Decl. ¶¶ 6, 10, ECF 49. If an inmate complained of a medical issue to them, they would instruct the inmate to request a medical appointment; if the inmate experienced a medical emergency in their presence, they would contact medical personnel. Bilbrey Decl. ¶¶ 9-11; Brantley Decl. ¶¶ 11-12. Both Bilbrey and Brantley do not remember Plaintiff describing to them any medical issues. Bilbrey Decl. ¶ 12; Brantley Decl. ¶ 13. Plaintiff alleges that Bilbrey and Brantley were made aware that the medical department was refusing to respond to Plaintiff's requests for treatment and that because of the lack of response, Plaintiff experienced chronic pain and irreparable damage. Compl. at 16. Plaintiff alleges that Bilbrey and Brandley chose to be deliberately indifferent to his medical needs. *Id.*

## B. Medical Treatment

### 1. December 2018 Medical Examinations

Sheridan medical staff examined Plaintiff twice in December 2018. Cantu Decl. ¶¶ 7-9; Grasley Decl. ¶¶ 18-19. During a health screen on December 18, 2018, Plaintiff was seen by Dr. Beth Cloos, a Public Health Service employee serving as medical staff at Sheridan.[5] Cantu Decl.

---

[4] *See supra* n.2.

[5] The Court dismissed all claims against Dr. Cloos. *See supra* n.2.

¶ 7. Dr. Cloos reviewed Plaintiff's medical history with him. Grasley Decl. Ex. B, at 53-58. Plaintiff reported to Dr. Cloos that he was experiencing neck pain and sometimes experienced weakness on the left side of his body which he attributed to his previous neck surgery. *Id.* at 55. Dr. Cloos instructed Plaintiff how to obtain medical, dental, and mental health care. *Id.* at 57. Dr. Cantu reviewed Dr. Cloos's record of this encounter later that day. *Id.* at 58; Cantu Decl. ¶ 7.

On December 21, 2018, Dr. Cantu saw Plaintiff for his routine medical history and physical examination. Cantu Decl. ¶ 8. Based on Plaintiff's reports of a prior lung cancer diagnosis and complications including lasting neck pain from a prior spinal injury, Dr. Cantu ordered spinal and chest X-rays. Cantu Decl. ¶ 8; Grasley Decl. ¶ 19. Plaintiff told Dr. Cantu that even though follow-up care was recommended by physicians before Plaintiff arrived at Sheridan, he did not participate in any follow-up appointments. *Id.* Dr. Cantu also submitted a request for Plaintiff's past medical records and conducted a full examination, noting the presence of "neck pain" and "cervicalgia" with no apparent left arm or leg deficits or muscle atrophy. *Id.*; Grasley Decl. Ex. B, at 44. Dr. Cantu concluded the visit by speaking to Plaintiff about his mental health concerns and instructing Plaintiff on how to obtain further medical, dental, and mental health care. Cantu Decl. ¶ 8; Grasley Decl. ¶ 19.

### 2. February 2019 Radiology Reports

In early February 2019, Dr. Grasley reviewed the radiology reports that Dr. Cantu had ordered. Grasley Decl. ¶ 21. The radiology reports, a chest X-ray and a spinal X-ray, did not indicate any emergent medical concerns. *Id.* The chest X-ray Dr. Cantu ordered showed that Plaintiff's "cardiac silhouette" was normal, "mediastinal and hilar contours [were] unremarkable," and "lungs and pleural spaces are clear." Cantu Decl. ¶ 9; Grasley Decl. ¶ 20. Because Plaintiff's chest X-ray did not indicate any signs of lung cancer, Dr. Grasley determined that no follow-up treatment was necessary. Grasley Decl. ¶ 21. Plaintiff's spinal X-ray showed

"normal height and alignment" of the vertebral bodies, "no hardware failure," "no prevertebral soft tissue swelling," and that the "dens [was] intact." Cantu Decl. ¶ 9; Grasley Decl. ¶ 20. The spinal X-ray also showed the presence of "mild multilevel facet arthropathy" and "multilevel nuchal ligament ossifications overlaying the lower cervical spine." *Id.* These conditions are associated with back pain but do not require emergency attention and can be managed with certain topical and pain management treatment. *Id.*

Plaintiff was permitted to use over-the-counter and prescription medications to manage his pain. *See* Cantu Decl. ¶ 10, Grasley Decl. ¶ 21. Plaintiff had an active prescription for 800 mg Ibuprofen tablets with instructions to take them three times a day as needed for pain management. Grasley Decl. Ex. B, at 80. In addition to this prescription for Ibuprofen, Plaintiff informed staff that he was using the following over-the-counter medications: 1) Aspirin and Acetaminophen for pain management, and 2) Hydrocortisone and Tolnaftate cream for skin infection/inflammation. *Id.*

### 3. January – November 2019 Requests for Care

Between December 2018 and September 2019, the medical records Defendants provide contain no records of medical care nor requests for care. *See generally* Grasley Decl. Ex. B. Dr. Grasley states that these medical records are true and correct. Grasley Decl. ¶ 7.

Plaintiff's first recorded medical encounter of 2019 occurred on September 8, 2019, when BOP staff administered Plaintiff's annual flu shot in his cell. Grasley Decl. ¶ 22; Ex. B, at 42. BOP staff also recorded Plaintiff's reports of chronic pain and noted that Plaintiff had a normal gait and did not show any signs of distress. *Id.* Ex. B, at 41-42. Plaintiff requested a renewal of his Ibuprofen prescription and BOP staff provided one the next day, September 9, 2019. *Id.* at 41, 39-40, 75. Plaintiff was advised to follow up at sick call as needed. *Id.* at 42.

Plaintiff requested medical care on September 23, 2019 through a handwritten note. Grasley Decl. Ex. B, at 1. BOP staff informed him that he needed an evaluation before he could receive further treatment, he was on the schedule to be seen, and to "please be patient." *Id*. In this note, Plaintiff stated that he had sent 14 "cop-outs" and several electronic messages between January 1, 2019 and August 6, 2019, as well as another cop-out on September 11, 2019, which he says, "all went ignored." *Id.* None of these prior messages appear in the medical records.

In another note on November 30, 2019, Plaintiff conveyed that he was responding to a "disposition" on November 23, 2019. Grasley Decl. Ex. B, at 6. Plaintiff wrote that he had never been seen by medical staff except for his initial visit with Dr. Cantu in December 2018, and that his "many inmate requests" had been ignored. *Id.* Plaintiff repeated that he was in chronic pain and had received "no treatment whatsoever" despite trying for more than a year. *Id.* at 7. Staff responded that Plaintiff was on schedule to see a provider. *Id.* at 7.

### 4. December 2019 Injury and Follow-Up Care

On December 2, 2019, Plaintiff reported to one of the on-duty paramedics that he had "left knee pain" and that his "leg went out," causing him to fall to the floor and hit the back of his head. Grasley Decl. ¶ 23; Ex. B, at 146. At the time, Plaintiff stated he felt "fine." Grasley Decl. Ex. B, at 146. The paramedic conducted an examination and both Plaintiff and the paramedic agreed that Plaintiff's condition did not require emergency medical care and that instead "self-care" would be appropriate. *See* Grasley Decl. ¶ 23. Dr. Grasley reviewed and co-signed the record of this encounter. *Id.* As described by Dr. Grasley, "[s]elf-care generally means that an individual will take care of themselves using recommended treatment methods (i.e. over-the-counter medications, rest, applying ice/elevating, etc.) and monitor their health." *Id.* The patient is "instructed to immediately notify medical professionals or ask any BOP staff member

to contact Health Services" if their condition worsens. *Id.* The paramedic instructed Plaintiff to report to Sheridan's "sick call" for additional treatment if his condition worsened. *Id.*

Plaintiff claims that, although at the time his fall "didn't seem that bad," Plaintiff complained of worsening pain and symptoms the day after, and BOP staff ignored him. Compl. at 17. Grievance records indicate that Plaintiff requested medical attention for injuries and chronic pain on December 26, 2019; this grievance was rejected because it did not include an informal resolution signed by a unit manager. Grasley Decl. Ex. C, at 2. Plaintiff also submitted an informal request on January 1, 2020, seeking medical treatment for severe pain issues since his fall on December 2, 2019. *Id.* Ex. B, at 5. Plaintiff stated that the anti-inflammatories provided him no relief. *Id.* Staff responded that Plaintiff was on schedule to see a provider. *Id.*

On January 6, 2020, Plaintiff had a scheduled chronic care appointment at Sheridan Health Services. Allred Decl. ¶ 8; Grasley Decl. ¶ 24. He arrived at the exam room "[without] assist nor in evidence of distress." *Id.* Plaintiff brought with him a large envelope of old medical records to support his claim of chronic pain. *Id.* During the appointment, Dr. Allred determined there was no emergent medical concern and decided to place Plaintiff on "call-out" for a scheduled appointment for future treatment. *Id.* Dr. Allred also decided to review and summarize the available medical records to understand the history of Plaintiff's complaint, then reschedule him for a follow-up appointment to modify his treatment plan more effectively. Allred Decl. ¶ 8.

Plaintiff next sought medical treatment via an informal request to staff on January 27, 2020. Plaintiff was informed that he was scheduled for a follow-up appointment. Grasley Decl., Ex. B, at 3. Grievance records indicate that Plaintiff asked for medical attention for injuries and chronic pain on February 4, 2020; his grievance was rejected for writing in the wrong section of the appeal. *Id.* Ex. C, at 2. Plaintiff again sent an informal request on February 22, 2020, seeking

medical care for chronic pain and stating he had received no treatment for 16 months. *Id.* Ex. B, at 2. Staff responded that Plaintiff was scheduled for a medical consultation for neck pain. *Id.*

A follow-up appointment never occurred at Sheridan. At the onset of the COVID-19 pandemic, on March 3, 2020, Plaintiff was transferred to the Federal Correctional Institution at Terminal Island. Grasley Decl. ¶ 24; Ex. A, at 4. Plaintiff's routine medical care for pain management continued upon his arrival to Terminal Island. *Id.* ¶ 24.

### C. Pending Litigation

On February 3, 2020, Plaintiff filed a *Bivens* action against Defendants in their individual capacities as federal employees at Sheridan in connection with his medical treatment. Plaintiff alleges that Defendants were aware of his medical issues and that their failure to act resulted in irreparable damage to Plaintiff's health. Plaintiff asserts these claims: (1) "failure to protect," (2) "deliberate indifference to serious medical needs," (3) "denial of medical treatment for serious medical needs," (4) "wanton infliction of pain," (5) "intentionally interfering with pain management treatment previously prescribed," (6) "threatened with irreparable harm," and (7) cumulative "cruel and unusual punishment." Compl. at 17-23. These seven claims allege that Defendants were deliberately indifferent to Plaintiff's ongoing medical concerns involving a prior back injury and necessity for pain management. Plaintiff also alleges that no treatment was provided. Because Plaintiff discusses deliberate indifference in each of these claims, the Court construes Plaintiff's complaint to state a single claim of deliberate indifference under the Eighth Amendment.

## DISCUSSION

Defendants move for summary judgment, contending that Plaintiff failed to exhaust available administrative remedies. In the alternative, if Plaintiff had successfully exhausted, Defendants contend that Plaintiff's claims fail on the merits.

PAGE 10 – ORDER

A.  **Administrative Exhaustion**

Defendants ask the Court to terminate this action because Plaintiff failed to exhaust the prison's administrative remedies. The Prison Litigation Reform Act (PLRA) establishes an exhaustion requirement for cases brought "by a prisoner" under 42 U.S.C. § 1983 "or any other Federal law." 42 U.S.C. § 1997e(a). The Supreme Court has concluded that *Bivens* actions are governed by the exhaustion requirement of the PLRA. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("Thus federal prisoners suing under *Bivens* . . . must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit."). The Supreme Court, however, in deciding whether exhaustion under PLRA was an element a plaintiff must allege or "an affirmative defense the defendant must plead and prove," concluded that "failure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007).

Defendants did not allege failure to exhaust as an affirmative defense in their Answer. *See* ECF 31 at 5. They alleged only one affirmative defense, that they properly discharged their duties. They reserved the right to allege other affirmative defenses, but they never moved to amend their Answer. Thus, Defendants may not seek summary judgment on the affirmative defense of failure to exhaust.[6]

---

[6] Even if the Court overlooked Defendants' failure to plead the affirmative defense of failure to exhaust, Defendants fail to meet their burden at summary judgment to show that there is no disputed issue of fact on exhaustion. Plaintiff claims his grievances were "sent back for bogus reasons." Compl. at 7. He alleges that he tried in good faith to exhaust his administrative remedies, but that BOP staff members at Sheridan "go out of their way and do all that they can to thwart inmates from taking advantage of the grievance process" and prevented him from exhausting his claims through the administrative remedy system. *Id.* at 25. Plaintiff thus alleges that administrative remedies are effectively unavailable. Plaintiff also asserts that staff members deliberately blocked him from appealing his grievances. *Id.* at 7.

Defendants support their motion for summary judgment with a declaration from Dr. Grasley and Plaintiff's administrative remedy SENTRY report as evidence that Plaintiff did

PAGE 11 – ORDER

## B. Deliberate Indifference

A prison official's "deliberate indifference to serious medical needs of prisoners" violates the ban against cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05. Eighth Amendment violations for deliberate indifference to a prisoner's serious medical needs may constitute a cause of action for damages under *Bivens*. *See Carlson v. Green*, 446 U.S. 14, 17-18, 20 (1980).

In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show both a "serious medical need" and "deliberate indifference" to that need. *Estelle*, 429 U.S. at 104. In other words, there is "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014); *see also Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) ("[I]nmates must demonstrate that they were confined under conditions posing a risk of objectively, sufficiently serious harm and that the officials had a sufficiently culpable state of mind in denying the proper medical care.

---

not exhaust the four-part grievance procedure. *See* Grasley Decl. ¶¶ 25-28; Ex. C, at 1-4. The SENTRY report consists of unexplained abbreviations with terse "remarks" explaining why Plaintiff's grievances were rejected. These remarks include "You must include an informal resolution, BP8 that is signed by your unit manager" and "You cannot write on Part B of your Regional Administrative Remedy Appeal (BP-10)." *Id.* Ex. C., at 2. The grievances themselves are not attached or locatable (despite the Court's best efforts). The Court cannot conclude from this record that there is no dispute whether the procedural rejections were justified and that the administrative remedy was effectively available to Plaintiff.

Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation." (citation and quotation marks omitted)).

To meet the objective standard, a plaintiff must demonstrate the existence of a serious medical need. *Estelle*, 429 U.S. at 104. Such a need exists if failure to treat the condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quotation marks omitted).

For the subjective component, a plaintiff must show that "the defendant's response to the need was deliberately indifferent." *Id.* A showing of deliberate indifference requires demonstrating both "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* "Indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (quotation marks omitted). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence," but the standard "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

This standard "does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. Unforeseeable accidents or medical malpractice do not evoke valid claims of medical mistreatment under the Eighth Amendment. *Id.* at 105-06. Further, a prisoner's mere disagreement with his or her medical treatment is not actionable under the Eighth Amendment. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) ("[A] mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." (cleaned up)).

"Rather, to show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health." *Colwell*, 763 F.3d at 1068 (cleaned up).

Defendants argue that Plaintiff's medical records establish that Plaintiff had ample access to and received appropriate medical care for his prior back injury while at Sheridan. Defendants also argue that Plaintiff presents no evidence of either objective medical need or subjective indifference by prison officials in denying proper medical care. Characterizing Plaintiff's claims as a mere disagreement with his medical treatment, Defendants argue that there is no genuine issue for trial and summary judgment should be granted in their favor.

Whether or not Plaintiff can show an objectively serious illness or injury, Plaintiff fails to present a triable issue of fact on whether prison officials were *subjectively* aware of the seriousness of the condition and deliberately denied access to medical care. The evidence does not support Plaintiff's allegation that Defendants failed to provide "any type of treatment for serious medical issues." To the contrary, BOP medical records show that medical staff evaluated Plaintiff twice in December 2018, ordered X-rays to determine treatment for his back and neck pain, determined there was no need for emergency attention, and prescribed pain management procedures. Plaintiff alleges he experienced pain after falling on December 2, 2019. But when Plaintiff met with paramedics that day, he stated that he felt "fine," and the paramedics determined there were no emergent medical needs. Plaintiff again met with medical staff on January 6, 2020, during which Dr. Allred determined there was no emergent medical concern. The medical records thus indicate that prison officials were not subjectively aware of any condition more serious than what Plaintiff could manage through self-care. The records also

show that medical staff took seriously Plaintiff's requests for medical treatment: Plaintiff managed to schedule multiple appointments, receive X-rays, and receive pain management instruction and prescriptions. Plaintiff cannot show that Defendants deliberately denied him medical care.

The Court's conclusion that Plaintiff fails to demonstrate that Defendants had a sufficiently culpable state of mind in denying the proper medical care clearly applies to the first group of Defendants: the medical staff, Drs. Grasley, Cantu, Allred, and Ginsley. A question remains as to whether it also applies to the unit managers, Bilbrey and Brantley, who did not provide medical care to inmates. Non-medical prison staff who intentionally deny or delay access to medical care can be held accountable for deliberate indifference. *Estelle*, 429 U.S. at 104-05. Plaintiff claims that Bilbrey and Brantley knew medical staff were not responding to what he describes as serious medical issues. Defendants respond that neither Bilbrey nor Brantley recall Plaintiff describing medical issues to them; had he done so, both would have instructed him to request a medical appointment.

The Court accepts these statements as true because Plaintiff did not respond to Defendants' motion for summary judgment. Still, viewing all the evidence submitting by Defendants in the light most favorable to Plaintiff, there could be an issue of disputed fact on whether Bilbrey or Brantley helped delay Plaintiff's access to medical care in 2019. *See, e.g.*, Grasley Ex. B, at 1 (stating that 15 cop-outs and several electronic messages requesting medical care had been ignored between January 1, 2019 and September 11, 2019, during which Plaintiff did not see a doctor); Ex. C, at 2 (denying grievance requesting medical attention for lack of an informal resolution signed by the unit manager). Plaintiff, however, presents no evidence suggesting that either Defendant *intentionally* delayed an appointment.

Regardless of this potential factual dispute, Plaintiff cannot show that Bilbrey or Brantley were deliberately indifferent to his medical needs because the medical records indicate he received all medical services that the medical staff deemed necessary, as well as information on self-care. In other words, the evidence shows that there was no additional, necessary medical care for Bilbrey or Brantley to deny or delay. Thus Plaintiff fails to present a genuine dispute of material fact on deliberate indifference for any Defendant.

To the extent that Plaintiff disagrees with the treatment he received, mere disagreement is not actionable. *See Toguchi*, 391 F.3d at 1058. Plaintiff alleges that he needed more treatment generally to manage his pain and prevent future risks of harm. Defendants, however, provide evidence contradicting this allegation: the radiology reports and other examinations conducted by medical staff conclude that Plaintiff had no emergent medical concerns and did not require emergency attention or follow-up treatment. Even if Defendants' approach could be considered more conservative than an alternative approach, Plaintiff fails to demonstrate why the course of treatment the doctors provided was so "medically unacceptable under the circumstances" as to rise to a constitutional violation. *Colwell*, 763 F.3d at 1068.

Such disagreements in treatment do not rise to the level of a constitutional violation, as Judge Papak explained in a similar case:

> Melendez may have disagreed with the conservative approach adopted by SRCI Health Services for addressing his pain symptoms, and it is possible that he would have obtained greater pain relief earlier had SRCI Health Services adopted a more aggressive approach earlier, but absent any evidence that the approach actually adopted was medically unreasonable and in light of the evidence of record that Gulick and other SRCI Health Services personnel continuously provided Melendez with medical care calculated to address his symptoms, as a matter of law a finder of fact could not find that the initial conservative approach constituted a breach "of constitutional proportions" of the

PAGE 16 – ORDER

> government's duty to provide medical care to an incarcerated prisoner.

*Melendez v. Gulick*, 2018 WL 4473576, at *4 (D. Or. Sept. 18, 2018) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Similarly, absent any evidence that Plaintiff needed pain management or other care beyond what he received at Sheridan, Plaintiff has not shown that any of the individual Defendants' failure to provide additional treatment amounted to deliberate indifference. The Court grants summary judgment on this claim.[7]

## CONCLUSION

The Court GRANTS Defendants' Motion for Summary Judgment, ECF 47.

**IT IS SO ORDERED**.

DATED this 5th day of July, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[7] Because the Court finds that Plaintiff fails to offer facts sufficiently describing a violation of a constitutional right, the Court declines to reach Defendants' final arguments on qualified immunity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (requiring that the constitutional right in question be "clearly established law" to hold a government official accountable for violating that law).

PAGE 17 – ORDER